Edward C. REA and 22 Ford Inc.,
a corporation

v.

**FORD MOTOR COMPANY, a corporation, Appellant.**

No. 73–1190.

United States Court of Appeals,
Third Circuit.

Argued Jan. 7, 1974.

Decided April 26, 1974.

Certiorari Denied Oct. 15, 1974.
See 95 S.Ct. 126.

Frank L. Seamans, John H. Morgan, Edward G. O'Connor, and David E. Tungate, of Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa. and Hugh B. Cox, Edwin M. Zimmerman, and James R. Atwood, of Covington & Burling, Washington, D. C., for appellant.

Robert A. Jarvis, Raymond W. Cromer, Eugene J. Reinbold, of Beck, Mc-

Ginnis & Jarvis, Pittsburgh, Pa. and Robert E. Wayman, Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa. and Thomas M. Kerr, Pittsburgh, Pa., for appellees.

John A. Metz, Jr., and H. G. Beamer, III, of Metz, Cook, Hanna & Kelly, Pittsburgh, Pa., for Ford Dealers Alliance, Inc., amicus curiae.

Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Western District of Pennsylvania. The judgment required Ford Motor Company ("Ford") to pay damages to 22 Ford Inc. ("22 Ford"), a corporate franchised Ford dealer, in the amount of $3,350,000. for injuries claimed to have been caused by violation of the Sherman Act, 15 U. S.C. §§ 1 and 2, and the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq., and to pay damages to Edward C. Rea ("Rea"), the principal stockholder of 22 Ford, in the amount of $29,683. for breach of an oral contract to convey real estate.

Ford is the second largest manufacturer of automobiles in the United States. It manufactures approximately 25% of the automobiles sold in this country, a market share that has not changed significantly during the period relevant here. With one exception—sales to the United States Government—Ford sells no automobiles directly to ultimate customers but, rather, sells to franchised retail dealers who then resell the automobiles to the public. At the time of trial, approximately 97% of these retail outlets were independently owned and financed. A relatively small number of the remaining 3% of the re-

tail outlets were wholly-owned subsidiaries of Ford.[1] The remainder were "dealer development" outlets in which Ford and private parties share the investment, and which are established in the expectation that the private participant will acquire full ownership of the outlet out of his share of its profits.[2] 22 Ford holds a Ford franchise in Monroeville, Pennsylvania, a suburb of Pittsburgh, which was originally given in February 1964 to Edward C. Rea, Inc. Thereafter the franchise was assigned to 22 Ford with Ford's permission.

The complaint in this case originally alleged seven causes of action. Prior to the trial, the district court granted Ford's motion for summary judgment on the causes of action that sought specific performance of the contract to convey real estate and to establish a lien on the real property involved. See Rea v. Ford Motor Co., 326 F.Supp. 627 (W.D.Pa. 1971), appeal dismissed (3d Cir. Nos. 71–1780/1, 1972). At the conclusion of the evidence, the district court directed a verdict for Ford on the claims alleged under the Robinson-Patman Act, 15 U. S.C. § 13(d) and (e).[3] The court denied defendant's motion for a directed verdict on the four remaining causes of action and submitted them to the jury with instructions to return a special verdict in the form of answers to nine questions (see Appendix to this opinion). In response to the court's questions, the jury in substance found: (1) that there was a binding oral contract between Rea and Ford for the transfer of real estate, that Ford had breached the contract, and that Rea had thereby been damaged in the amount of $29,683.; (2) that Ford had violated the Automobile Dealers' Act and that 22 Ford had thereby been damaged in the amount of $350,000.; (3) that Ford had engaged in a combination or conspiracy which unreasonably re-

1. At the time of trial, only 13 of the 6000 Ford outlets in the United States were company owned.

2. In the relevant period, the number of Ford dealer development stores in the United States has ranged between 100 and 170.

3. Those claims were embodied in a separate cause of action and were also urged by plaintiffs in support of their cause of action under the Sherman Act.

strained interstate trade in Ford motor vehicles at the retail level in the area covered by the Pittsburgh Sales Office of Ford and had attempted to monopolize such trade, and that plaintiffs had thereby suffered damage in the amount of $1,750,000.; and (4) that Ford had not violated Section 3 of the Clayton Act, 15 U.S.C. § 14, making it unlawful to make a sale or contract for sale of goods on condition that the purchaser shall not use or deal in goods of a competitor, where the effect is substantially to lessen competition or tend to create a monopoly in any line of commerce.

The district court denied Ford's post-trial motions for a directed verdict, or in the alternative, for a new trial, but held that the damages fixed by the jury were excessive and that a motion for a new trial would be granted unless 22 Ford filed a remittitur for all single damages in excess of $1,000,000. Rea v. Ford Motor Co., 355 F.Supp. 842 (W.D. Pa.1973). The plaintiffs filed such remittitur and the district court amended its judgment accordingly. This appeal by Ford involves the three causes of action upon which the district court entered judgment for plaintiffs: the oral contract for the conveyance of real estate, the Automobile Dealers' Act, and the Sherman Act. We shall consider each seriatim.

## I. ORAL CONTRACT FOR CONVEYANCE OF REAL ESTATE

In response to special interrogatories, the jury found that Ford had orally agreed to sell Rea the real estate in Monroeville upon which 22 Ford and its predecessor have conducted a Ford dealership since December 1964, that Ford failed to perform this contract, and that, as a result, Rea had been damaged in the amount of $29,683., this figure representing the cost to 22 Ford of acquiring and installing trade fixtures in the building used for the dealership. The jury found that there existed a binding oral contract between Rea and Ford, which was then owner of the land, under which Rea was to take title to the land (in his own name or in the name of a corporation formed by him) to lease the land to Ford, with a lease-back from Ford to 22 Ford, and that Ford breached such contract by failing to convey title to Rea. The jury therefore awarded to Rea as damages the cost of the improvements that he had to make in order to get the dealership service facility operating.[4] Although there is sufficient evidence to support the jury's finding of Ford's breach of contract, Rea is not entitled to maintain suit at this time. Under Pennsylvania law, a person who enters and makes permanent improvements on the land of another in reliance on an oral contract for the sale of the land cannot recover for their value so long as he remains in uninterrupted enjoyment of the improvements. Naftzinger v. Roth, 93 Pa. 443 (1880).[4a] It is true that Rea, unlike the plaintiff in *Naftzinger*, is not legally entitled to possession of the land and improvements, for the present lessee is not Rea but 22 Ford. However, it is not necessary to "pierce the corporate veil" in order to apply the holding of *Naftzinger* to this case. Rea's contract with Ford, as found by

---

4. Under Pennsylvania law, which the parties have agreed covers this claim, damages for breach of a parol contract for the sale of land are limited to the expenses incurred on the faith of the contract. Polka v. May, 383 Pa. 80, 84, 118 A.2d 154, 156 (1955); Rineer v. Collins, 156 Pa. 342, 27 A. 28 (1893). In its post-trial motions, Ford contended that Rea was not entitled to recover damages since it was 22 Ford that paid for the improvements, but the district court held that the source of the money did not prevent Rea's recovery. Rea v. Ford Motor Co., 355 F.Supp. at 856–857.

4a. There is nothing in the language of *Naftzinger* limiting its holding to the case of a tenant. The rationale of that decision, rather, was that the plaintiff (Roth) was enjoining the use of the land and improvements and therefore had not yet suffered any loss under the terms of the contract, which provided that Roth should move on the property, build himself a house, barn and blacksmith shop, pay rent as long as Naftzinger lived, and receive the property when Naftzinger died.

the jury, specifically provided for an eventual lease-back to 22 Ford, and 22 Ford, as lessee, has had the full use and benefit of the equipment and improvements since 1964, has amortized the costs of the equipment, and has taken corresponding deductions on its income tax returns. Moreover, since it appears from the testimony that the value of the improvements was not included in the rental charge by Ford, there has not yet been any loss suffered by 22 Ford, and future losses, if any, are entirely speculative at this time.[5] Therefore, we conclude that Rea, "being in the enjoyment of all that came within the contract, as he stated it," Naftzinger v. Roth, 93 Pa. at 448, is not entitled to maintain suit as long as 22 Ford continues in possession and enjoyment of the improvements.[6] Thus that part of the district court's judgment awarding damages to Rea for violation of the oral agreement will be set aside.

## II. AUTOMOBILE DEALERS' DAY IN COURT ACT CLAIM

In its pleadings and pre-trial statement, 22 Ford originally alleged that Ford had violated the Automobile Dealers' Day in Court Act ("Automobile Dealers' Act") by refusing to enter into a particular real estate transaction with Rea and by competing with 22 Ford through company-owned dealerships. The district court directed a verdict for Ford on these claims at the close of plaintiffs' case. At the same time, however, the court suggested *sua sponte* a new and different claim under the Automobile Dealers' Act which 22 Ford thereafter embraced. The gist of that new claim was that sometime between February and August 1964 Ford violated the Act by threatening to cease shipping Ford cars to 22 Ford's predecessor as a Ford dealer in Monroeville, unless a separate corporation, in which Rea was the principal stockholder, resigned its franchise as an Oldsmobile dealer in a neighboring town.[7] The evidence underlying that claim is as follows:

Edward C. Rea, Inc. was given a franchise as a Ford dealer in Monroeville in February 1964. The Ford Sales Agreement which established the terms and conditions of that franchise provides that "the Dealer reserves the right to make purchases from others without obligation or liability of any kind to the Company, provided that the Dealer shall not be relieved of any duty, obligation, or responsibility assumed by the Dealer under this agreement . . . ." At that time Rea was the principal stockholder in another company, then known as Rea Oldsmobile, Inc. ("Rea Olds"), which conducted an Oldsmobile dealership in Wilkinsburg. During the negotiations for the granting of the Ford franchise to Edward C. Rea, Inc., Rea represented to Ford that he would acquire the capital necessary for the operation of the Ford franchise at Monroeville by liquidating the assets of Rea Olds, and Ford required Rea to sign a letter stating his intention to give up the Oldsmobile dealership and to send a letter to Oldsmobile stating his intent to resign.

For a time in 1964 Edward C. Rea, Inc. operated in a temporary facility because a new Ford facility, whose preparation and use required a substantial

---

5. Such future losses are claimed to be the value of improvements placed on the land by plaintiffs. Conceivably 22 Ford could remain on the property until the improvements had been totally worn out and would, therefore, never suffer any loss.

6. When the lease expires or 22 Ford otherwise is ejected from or leaves the premises, there may at that time be recovery of damages for the unamortized value, if any, of the equipment and improvements. See Walter v. Transue, 17 Pa.Super. 94, 100 (1901).

7. Plaintiffs originally claimed that Ford had violated Section 3 of the Clayton Act by requiring 22 Ford not to deal in the goods of a competitor, and testimony about the alleged threat was introduced on that theory. In its instructions on the claim under Section 3, the court stated that it did not believe there was any evidence that the alleged conduct of Ford had adversely affected competition, and the jury returned a verdict for Ford on this claim.

amount of capital, was not yet available. Sometime between February and August 1964, before the new facility was available, Rea suggested to McClanathan, then district manager for Ford, that Rea Olds might not liquidate its operation. Rea testified that in response McClanathan threatened to stop shipping Ford automobiles to the Monroeville dealership unless Rea Olds resigned its Oldsmobile franchise. McClanathan denied making the alleged threat to withhold cars, but he did testify that he told Rea that he thought the Oldsmobile dealership should be liquidated in order to assure an adequate source of capital for the conduct of the Ford dealership in the new Monroeville facility. Thereafter Rea Olds resigned the Oldsmobile franchise, retained part of its assets, and sold the remainder to another corporation. Sometime after August 31, 1964, Rea Olds changed its name to 22 Ford, Inc., the present plaintiff, and took over operation of the Ford Monroeville dealership in its new facility. The Ford franchise agreement at Monroeville was assigned to 22 Ford on March 9, 1966, by Edward C. Rea, Inc., which was then dissolved. This assignment was accepted and consented to by Ford on April 21, 1966.

On the basis of this evidence, the jury found that Ford breached its duty "to act in good faith in performing or in complying with any of the terms or provisions of the franchise," as required by Section 2 of the Automobile Dealers' Act, 15 U.S.C. § 1222, and awarded to 22 Ford damages in the amount of $350,000., representing an estimate of the profits that Rea Olds would have made if it had continued to operate the Oldsmobile franchise.

After careful consideration and recognizing the record on the issue of liability presents a close case, we have concluded that defendant is not entitled to either the entry of judgment in its favor or a new trial to determine the question of liability on this claim. Ford challenges the jury's finding that it violated the Automobile Dealers' Act on several grounds.

First, Ford argues that since the protection of the Act is confined to the relations between the manufacturer and its dealer as supplier and distributor, respectively,[8] 22 Ford can recover only for damages sustained by it in its capacity as a Ford dealership as a result of Ford's failure to act in good faith with respect to the operations of that dealership. However, plaintiffs produced evidence to show that the coercive statements complained of here were intended to and did cause Rea Olds to surrender its Oldsmobile franchise, and the claimed damages are those suffered by Rea Olds by that surrender; there is no suggestion that Ford's threats were designed to control or coerce the conduct of Edward C. Rea, Inc., as a Ford dealer or that they resulted in any damage to the Monroeville Ford dealership. Furthermore, although Rea Olds, after surrendering its Oldsmobile franchise and liquidating its assets, changed its name to 22 Ford and succeeded to the Ford franchise of Edward C. Rea, Inc., those transactions cannot serve to give 22 Ford a cause of action for injuries predating its affiliation with Ford.[9] Thus, Ford concludes, there is no basis under

---

8. The legislative history of the Act includes the following statements as to its purpose:

"It imposes upon the factory the affirmative obligation to act in 'good faith' in all dealings or transactions with its dealers." S. Rep.No.2073, 84th Cong., 2d Sess. 4 (1956). "These bills impose upon any automobile manufacturer granting a franchise to an automobile dealer the duty of acting in 'good faith in his relationship with that dealer." Hearings on H.R. 11360 and S. 3879 Before the Anti-Trust Subcomm. of the House Comm. on the Judiciary 84th Cong., 2d Sess. 3 (1956) (Introductory Remarks Congressman Celler).

9. "Unquestionably, the Act does not apply until a manufacturer-dealer relationship has been created." Lewis v. Chrysler Motors Corp., 456 F.2d 605, 606–607 (8th Cir. 1972). See also Hanley v. Chrysler Motors Corp., 433 F.2d 708, 710–711 (10th Cir. 1970).

the Automobile Dealers' Act for the jury's finding that it is liable to 22 Ford for a breach of its duty of good faith.

■ The district court held, in response to this argument, that this cause of action was included in the transfer of rights under the dealership agreement to 22 Ford in April 1966 and thus 22 Ford, as the successor to the rights of Edward C. Rea, Inc. under the franchise, was entitled to bring suit and recover damages. Rea v. Ford Motor Co., 355 F.Supp. at 862–863. This analysis, however, does not entirely meet the objection raised by Ford, since it assumes one of the points in issue—whether Edward C. Rea, Inc. could recover for the damages suffered by Rea Olds. Nevertheless, we find Ford's argument on this point does not justify its contention that it is entitled to judgment on this claim, for it is based on too narrow and technical an interpretation of who the "dealer" is under the facts of this case. Edward C. Rea was not only a signing party to the franchise agreement between Ford and Edward C. Rea, Inc., but was made essential to the operation of the dealership by its terms, which recited that Ford had entered into the agreement "in reliance (i) upon the representation and agreement that . . . [Edward C. Rea] substantially participate(s) in the ownership of the Dealer . . . and (ii) upon the representation and agreement that . . . [Edward C. Rea] shall have full managerial authority for the operating management of the Dealer in the performance of this agreement." Rea, therefore, had a cause of action under the Automobile Dealers' Act against Ford for any bad faith in coercing him, as President and principal stockholder of

Rea Olds, to surrender the Oldsmobile franchise and to recover damages suffered by Rea Olds as a result of such surrender. See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786, 790–791 (5th Cir. 1971); Kavanaugh v. Ford Motor Co., 353 F.2d 710 (7th Cir. 1965).[10]

Second, Ford argues that even if 22 Ford's claim is a proper one under the Act, the record contains insufficient evidentiary support for the jury's finding of a violation. Ford accepts, as it must, the jury's finding, implicit in its verdict, that McClanathan, Ford's regional manager in the Pittsburgh area, made statements to Rea that could be construed as a threat to terminate the shipment of cars to Edward C. Rea, Inc., unless Rea had Rea Olds surrender its Oldsmobile franchise. Nevertheless, Ford contends that such a threat does not constitute a breach of its duty to act in good faith since its purpose was to force Rea to honor his earlier representations to Ford that he would obtain a substantial part of the capital required for the operation of the new Ford outlet by liquidating the assets of Rea Olds, and thereby to protect Ford's lawful interest in the capital requirements of Edward C. Rea, Inc.[11]

■■ As defined by the Automobile Dealers' Act, the term "good faith" means

" . . . the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or in-

---

10. We note that Albert D. Rea, the minority stockholder in Edward C. Rea, Inc., although also made essential to the operation of that dealership by the terms of the franchise agreement, is not named as a party to this case. The district court on remand should determine whether Albert D. Rea should be joined as a party under F.R.Civ.P. 19–21 and whether the damages to which Edward C. Rea is entitled by virtue of his percentage of stock ownership should be diminished. See Coman v. Coman, 492 F.2d 273 (3d Cir. 1974).

11. Ford points out that the franchise contract required Edward C. Rea, Inc. to maintain at all times and employ in its business such working capital as was required to enable it fully to carry out its obligations and responsibilities under the agreement.

timidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

15 U.S.C. § 1221(e). In applying this definition, it is necessary for the finder of fact to consider not only whether one party brought pressure to bear on the other, but for what reason it did so. See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., *supra* at 791. As the district court correctly instructed the jury in this case, relying on Berry Brothers Buick, Inc. v. General Motors Corp., 257 F.Supp. 542, 546 (E.D.Pa. 1966), aff'd, 377 F.2d 552 (3d Cir. 1967) (per curiam), a violation of this Act results if there is "a wrongful demand [made] which will result in sanctions if not complied with".

A manufacturer does not breach its duty to act in good faith by terminating a franchise when a dealer has failed to fulfill a reasonable obligation or agreement made in connection with the operation of the dealership. See, e. g., Garvin v. American Motors Sales Corp., 318 F.2d 518 (3d Cir. 1963); Milos v. Ford Motor Co., 317 F.2d 712 (3d Cir.), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963). And among those agreements which a manufacturer may in good faith require that a dealer carry out is the obligation to abide by reasonable net capital guidelines. See Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3d Cir. 1964).

However, whether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case.[12] As the court stated in York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., *supra* at 791, assuming there is evidence supporting a finding of a lack of good faith, "it is up to the jury to determine the redemption value of the facts indicating that the action could have been taken in good faith." We hold that the evidence in this case, as viewed most favorably to the plaintiffs, is sufficient to support the jury's finding that Ford breached its duty to act in good faith by threatening to stop supplying cars to Edward C. Rea, Inc., unless Rea Olds resigned its Oldsmobile franchise. See Rea v. Ford Motor Co., 355 F.Supp. at 857–861. The effect of that threat was to violate the dealer's right to purchase cars from other manufacturers, which right was not only guaranteed by the franchise agreement but apparently also of particular concern to Congress when it enacted the law.[13] While there was also testimony that Ford's motive was to assure that its dealer met its capital guidelines by carrying out what it had earlier represented it would do, the credibility and weight to be given to that testimony in determining the issue of good faith were properly left to the jury.

Third, Ford argues that 22 Ford is not entitled to maintain this cause of action under the Act, since it did not give notice to the Chairman of the Company's Dealer Policy Board of

12. In Globe Motors, Inc. v. Studebaker-Packard Corp., *supra*, the dealer challenged the good faith of the imposition of the financial requirements and the insistence by the manufacturer that they be met; hence, there was never any question as to whether or not the manufacturer's actions were motivated by a desire to protect his legitimate interest in the capital condition of the dealer.

13. "The existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct. For example, manufacturer pressure, direct or indirect, upon a dealer to accept automobiles, parts, accessories, or supplies which the dealer does not need, want, or feel the market is able to absorb, may in appropriate instances constitute coercion or intimidation. Similarly coercion or intimidation may be found where the manufacturer attempts to require the dealer to handle exclusively, or sell a specified quota of, parts, accessories, and tools made or approved by the manufacturer." II.Rep.No.2850, 84th Cong., 2d Sess. (1956), quoted at 3 U.S.Code Cong. & Admin.News, p. 4603 (1956).

the statements of McClanathan as required by the provision of the franchise agreement which sets up procedures for review of allegedly unfair actions by Ford or its representatives.[14] The district court found that there is nothing in that provision which requires a dealer to submit disputes to the Dealer Policy Board as a prerequisite to bringing suit in court for violation of the Act. Rea v. Ford Motor Co., *supra* at 862. We need not decide this issue on this record, since defendant does not appear to have raised this defense prior to the return of the jury verdict. However, in light of the Act's purpose,[15] it may be that a dealer should not be denied the opportunity to pursue his statutory cause of action because of a failure to invoke a contractual grievance procedure. See Blenke Brothers Co. v. Ford Motor Co., 217 F.Supp. 459, 464 (N.D.Ind.1963).

█ Finally, Ford argues that the introduction of a new theory of liability at the close of the plaintiffs' case prejudiced Ford in its defense to the Dealers' Act claim. In particular, Ford points out that the question of whether Edward C. Rea, Inc. would have had adequate capital to carry on the Ford franchise absent the liquidation of Rea Olds did not become relevant until that time.[16] Thus, Ford contends, since it did not receive any pre-trial notice that this would be a decisive issue in the case, it was denied a fair opportunity to prepare and present a full showing that the liquidation of Rea Olds was necessary to provide Edward C. Rea, Inc. with sufficient capital to discharge its obligations as a Ford dealer.

After an examination of the record, we cannot say that it was an abuse of discretion for the district court to submit this claim to the jury in spite of the failure of plaintiffs to allege it prior to trial, or, in fact, until the end of their case, when it was suggested by the trial judge. See Rea v. Ford Motor Co., *supra* at 861–862. Ford had the opportunity to, and did in fact, introduce evidence tending to demonstrate that Ford reasonably believed that the assets of Rea Olds were Rea's sole source of capital for the operation of the Ford dealership.[17] It is possible that with more advance notice, Ford could have adduced further evidence to establish

14. Paragraph 2(g) of the franchise contract provides:

"In the interests of maintaining harmonious relationships between the parties to this agreement, the Dealer shall report promptly in writing to the Chairman of the Company's Dealer Policy Board, or to such other person as may be designated by the Executive Committee of the Company from time to time, any act or failure to act on the part of the Company or any of its representatives, which the Dealer deems not to have been, or that the Dealer proposes to use in support of a claim that the Company has not acted, in good faith as to the Dealer. For the purposes of this subparagraph 2(g), the term 'good faith' shall mean the Company and its representatives acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion, intimidation, or threats of coercion or intimidation from the company."

15. The statute has as its purpose to create "a cause of action where none previously existed in that, *irrespective of contractual provisions*, it grants a right of review in the Federal courts of disputes between automobile manufacturers and their dealers involving the good faith of the manufacturer in complying with, in terminating, or in not renewing franchises." (Emphasis supplied.) H.Rep.No.2850, 84th Cong., 2d Sess. (1956), quoted at 3 U.S.Code Cong. & Admin.News, p. 4596 (1956). See also Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172 (S.D.Cal.1959).

16. The pre-trial proceedings, including discovery, and a large part of the trial were conducted on the assumption that McClanathan's threats were relevant only to the claim under Section 3 of the Clayton Act. Ford's principal defense to that claim was that there had been no substantial lessening of competition, a defense which was ultimately accepted, but which was of no relevance under the Dealers' Act.

17. McClanathan and a second Ford representative testified that Rea had never indicated to them that he had any source of capital to invest in a Ford dealership except the assets of Rea Olds.

with greater certainty the objective necessity for Rea Olds' liquidation of its franchise.[18] However, the issue before the jury was Ford's *good faith* in pressuring Rea to surrender the Oldsmobile franchise.

While we thus conclude that the jury's finding that Ford violated the Automobile Dealers' Act should be sustained, we hold that its award of damages thereunder is excessive and must be set aside. The jury's award of $350,000. apparently represents a straight-line projection of Rea Olds' estimated profits over the period from its termination of the GM franchise in September 1964 to the time of trial in May 1972, based upon a formula devised by Dr. Staelin, 22 Ford's expert. It has been held that an automobile dealer may recover damages for the loss of future profits resulting from the manufacturer's wrongful conduct under the franchise agreement. See American Motors Corp. v. Semke, 384 F.2d 192, 199–200 (10th Cir. 1967). However, the jury's award here failed to reflect the fact that in 1964 Rea Olds sold certain of its assets for $60,000. and that this cash and the remaining assets of the company were thereafter devoted to the operation of the Monroeville Ford franchise.[19] To award 22 Ford recovery of anticipated profits from the Oldsmobile franchise without any deduction for the asset sale or for the fact that it benefited by having the retained cash and assets available for the operation of the new Ford franchise is to permit a double recovery.

*Cf.* Gustafson v. General Motors Acceptance Corp., 470 F.2d 1057, 1061 (8th Cir. 1973). The award of damages in favor of plaintiffs for defendant's violation of the Dealers' Act will, therefore, be vacated and the case remanded for a redetermination of such damages in light of this opinion.

### III. SHERMAN ACT CLAIMS

As alleged in its complaint and developed at trial, 22 Ford's claims under the Sherman Act, 15 U.S.C. §§ 1 and 2, rested primarily on the charge that Ford had violated Sections 1 and 2 of the Act by its operation of company-owned and dealer development outlets in the Pittsburgh area. In its pre-trial statement, 22 Ford added an additional claim that by reason of certain arrangements with nationwide car rental companies, such as Hertz and Avis, Ford had engaged in unlawful price fixing. The jury's award of damages to 22 Ford under the Sherman Act apparently rested for the most part on the claim relating to the operation of the company-owned outlets.[20]

### A. *The Claim Based On Ford's Operation of Company-Owned Outlets*

22 Ford claimed that in the Pittsburgh area Ford pursued a plan to operate its company-owned and dealer development stores in such a way as to impose an unreasonable restraint on interstate trade and for the purpose of driving independently owned Ford dealers out of the business of selling Ford automobiles. Although 22 Ford asserted

---

18. For example, Ford might have been able to find evidence to rebut Rea's testimony that he believed that if Rea Olds was not liquidated, he could have borrowed the required capital from a friend, Mr. Aiken, or from two banks.

19. The trial judge instructed the jury either to adopt or reject, in whole or in part, Dr. Staelin's estimate of the profits the Oldsmobile dealership would have earned from September 1, 1964, to the date of trial. That estimate was a projection based on past profits of the Oldsmobile franchise. Thus, neither the trial judge's instructions on damages nor Dr. Staelin's estimate made mention of or

took into account the benefit 22 Ford received from the cash and retained assets.

20. In its special verdict, the jury did not award separate damages for each violation of the antitrust laws. However, in its opinion denying Ford's post-trial motions, the district court took the view that the price-fixing charge accounted for only $34,200. of the $1,750,000. single damage award by the jury under the Sherman Act. Accordingly, in its opinion on defendant's post-trial motions and remittitur reducing all antitrust single damages to $1,000,000., the court attributed $34,200. in damages to the price-fixing charge.

that this plan was nationwide in scope, its evidence was directed primarily to Ford's operation of Triangle Motors ("Triangle"), a company-owned Ford dealership located in the East Liberty section of Pittsburgh.[21]

Triangle became a Ford-owned dealership in March 1961 when its independent operator fell into financial difficulty. It is undisputed that the dealership made rather modest profits in 1961, 1962, 1964 and 1968 and had losses, occasionally heavy losses, in other years until its closing in May 1969,[22] and that Triangle received from Ford substantial capital contributions, as well as loans which were largely repaid.

In addition, Bernard Schroll, who had been president and manager of Triangle from 1962 to 1967, testified that local Ford employees persuaded him to make expenditures for advertising and sales personnel which in his opinion were excessive,[23] and to sell as many cars as possible without regard to the dealership's profitability. Schroll also related several statements made to him by various Ford representatives purporting to show that Ford was prompted by a specific intent to drive independent Ford dealers like 22 Ford out of business and to monopolize the retail distribution of Ford cars.[24]

Finally, 22 Ford relied upon the opinion testimony of Richard Staelin, an assistant professor of marketing at Carnegie-Mellon University, to support its antitrust claims. Through the use of ta-

bles, Dr. Staelin showed that Triangle and other selected Ford and Lincoln-Mercury outlets operated at a loss in some years and attributed such losses to expenditures on "market variables" like advertising, rent, and sales personnel. On the basis of a theoretical mathematical model, Dr. Staelin concluded that it would be to Ford's economic advantage to operate company outlets at a loss because it could thereby increase its manufacturing profit by diverting sales from its competitors, such as General Motors and Chrysler. He therefore characterized those losses as a "subsidy" or "discount" given by Ford to its company-owned outlets. Dr. Staelin postulated that while such a policy would increase Ford's manufacturing profits by diverting sales from its competitors, it would also divert some sales from independent Ford dealers. However, he did not offer any evidence that in fact the operations of Triangle or other Ford company-owned stores had diverted any sales from Ford independent dealers and took the position that the effect of those operations on 22 Ford was not relevant to his testimony.

Dr. Staelin proceeded to estimate the damages on 22 Ford's antitrust claim by computing the average loss-per-car suffered by those company-owned Ford and Lincoln-Mercury outlets whose financial records he had used as the basis of his model. Dr. Staelin reasoned that 22 Ford was entitled to receive from Ford the same amount of "subsidy" for each car it had sold. Accordingly, he multi-

21. Triangle was the only company-owned outlet selling Ford automobiles in the Pittsburgh sales district, except for a period of several months when there was one other company store. Ford also operated up to three company-owned Lincoln-Mercury outlets in Allegheny County, and their financial records were placed in evidence. Allegheny Ford Truck Sales, Inc. is also wholly owned by Ford, but it sells no Ford passenger automobiles.

22. The profits averaged about $22,000., with a high of approximately $35,000. and a low of approximately $15,000. The losses averaged $63,000., with a high of $112,000. and a low of $10,000.

23. Rea also testified that he thought Triangle's advertising was in excess of what he could afford as a privately financed dealer, but no records of 22 Ford were introduced to compare the advertising expenditures of the two dealerships.

24. Ford argues that it is implausible to suppose that it intended to drive out of business its independent dealers in view of its reliance on them for the distribution of nearly all of the automobiles it manufactures and that the alleged statements by Ford executives must be interpreted as meaning that Ford intended to achieve market dominance over competing manufacturers.

plied the average annual loss-per-car of the Ford-owned outlets times the annual sales of 22 Ford. Apparently based on these calculations, the jury awarded $1.75 million in single damages on 22 Ford's antitrust claims, which the district court remitted to just under $1 million because of its view that Dr. Staelin had made an erroneous assumption in his calculations.

Ford has advanced a number of arguments why the verdict against it on this claim is erroneous and should be set aside. However, it is necessary for us to consider only one which we find meritorious and dispositive of this claim.

■ It is well established that a person seeking to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, cannot prevail merely by proof that the defendant has violated the antitrust laws. In addition, he must prove that the violation was a material cause of some injury to his business or property. See Deaktor v. Fox Grocery Co., 475 F.2d 1112, 1115 (3d Cir. 1973); Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830, 833 (3d Cir.), cert. denied 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962).[25] This principle is in no way qualified by the rule that once a plaintiff has shown that illegal conduct has caused some injury to his business or property, the trier of fact may make a reasonable estimate of damages, for a distinction must be made in claims under Section 4 of the Clayton Act be-

tween the fact of damages ("injury.") and the amount of damages. See Story Parchment Co. v. Paterson Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Flintkote Co. v. Lysfjord, *supra* at 392.

■ The record here provides no rational support for a determination, even by way of inference, that Ford's operation of its company stores caused any injury to the business or property of 22 Ford. There was no evidence that Triangle or any other Ford Company outlet engaged in predatory price cutting,[26] or that 22 Ford had been compelled to lower its prices because of such price cutting. Nor did 22 Ford attempt to prove that it had incurred greater operating expenses than it would have had to incur absent the operations of Triangle and other company outlets. There was no evidence that 22 Ford lost sales to Triangle because of the latter's prices, advertising, number of salesmen, or any other reason.[27] Finally, 22 Ford made no claim and presented no evidence that it had lost profits because of the operations of Triangle or other company outlets. Indeed, 22 Ford's counsel expressly disavowed any such claim:

> "What our position is in this case is what 22 Ford did or did not do is not relevant because we are not asserting in our case that 22 Ford sustained a loss of profits . . . [W]e haven't put any evidence in the record to indicate any particular loss sustained by 22 Ford." (N.T. 4312–13)

25. *Accord,* Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 802 (1st Cir.), cert. denied 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); Gottesman v. General Motors Corp., 414 F.2d 956, 961 (2d Cir. 1969); Martin v. Phillips Petroleum Co., 365 F.2d 629, 632 (5th Cir. 1966); Englander Motors, Inc. v. Ford Motor Co., 267 F.2d 11, 15 (6th Cir. 1959); Bendix Corp. v. Balax, Inc., 471 F.2d 149, 160 (7th Cir. 1972); Duff v. Kansas City Star Co., 299 F.2d 320, 322 (8th Cir. 1962); Flintkote Co. v. Lysfjord, 246 F.2d 368, 392 (9th Cir. 1957); Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561, 579 (10th Cir.), cert. dismissed 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962).

26. Indeed, the evidence indicated that Triangle charged an average of $50. *more* per car than did 22 Ford.

27. The evidence demonstrated that 22 Ford's percentage of sales in Pittsburgh's East Liberty area did not increase after Triangle and its successor went out of business. Such evidence tends to support the conclusion reached by a market analysis introduced by Ford that 22 Ford and Triangle serviced generally different market areas with only a limited number of overlapping potential customers.

Instead of attempting to prove that Triangle's operations had been the cause of some injury to the business or property of 22 Ford, 22 Ford chose to rely on the testimony of Dr. Staelin which suggested that Ford had provided "subsidies" to its company outlets for the purpose of increasing Ford's share of the total automobile market and which assumed that 22 Ford was entitled to receive in damages a comparable subsidy. Dr. Staelin's theory, however ingenious, simply does not establish the fact of injury required to recover treble damages under the Clayton Act. Nor can the absence of evidence as to injury be remedied by the district court's observation that "[i]n this day of mobility, it is reasonable to expect that customers would travel from one Ford dealer to another in the Allegheny County area to select a new car, particularly where they might be attracted by massive advertising and aggressive tactics of numerous salesmen." While such a conclusion is reasonable, it is also entirely speculative and cannot support the necessary finding that 22 Ford sustained an injury to its business or property as required by Congress for recovery under § 4 of the Clayton Act.

■ We conclude that there is insufficient evidence in this case that Ford's operation of its company-owned outlets caused any economic injury to 22 Ford and therefore that 22 Ford was not entitled to an award of damages for its alleged violations of the Sherman Act.[28] This decision, however, in no way undermines the proposition that automobile manufacturers are subject to the strictures of the antitrust laws in the operation of their wholly-owned outlets, and where a violation of those laws causes injury to the business of a competitor, they will be liable for damages. See, for example, Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453 (W.D.Pa.1968).

### B. *The Price-Fixing Claim*

■ 22 Ford's claim for damages as a result of Ford's alleged violations of the Sherman Act also rested on the contention that Ford had conspired with Hertz and Avis to fix the price at which those rental companies would buy new cars from 22 Ford and other dealers. The evidence showed that for many years the two major car rental companies had bought new Fords, as well as cars of other makes, from dealers at a fixed price of $50. over the manufacturer's invoice price to the dealer less 1%. Such price uniformity, especially if at an artificial level not related to the supply and demand of a given commodity may be evidence from which an agreement or understanding, or some concerted action operating to restrain commerce, may be inferred. See Triangle Conduit & Cable Co. v. Federal Trade Commission, 168 F.2d 175 (7th Cir. 1948), aff'd sub nom. Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110 (1949). Furthermore, after a careful review of the record, we believe that there is sufficient evidence to support an inference that Ford was a party to an agreement or understanding to

---

28. It would also appear that plaintiffs failed to establish a claim under Section 2 of the Sherman Act, since there was no evidence that Ford and its dealers were able to exclude actual or potential competition in the retail trade from the greater Pittsburgh market area and, therefore, had a dangerous probability of achieving monopolization in a relevant market. See American Tobacco Co. v. United States, 328 U.S. 781, 784–786, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207 (5th Cir. 1969); Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1284 (7th Cir. 1969), cert. denied 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970); Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968, 971 (8th Cir. 1968), cert. denied 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969). Furthermore, in view of this rule as to what constitutes an attempt to monopolize, it would appear to have been error for the district court to deny defendant's requests for charge Nos. 7 and 8.

fix the price at which Ford dealers would sell to Hertz and Avis.[29] Although Ford did not require its dealers to sell cars to Hertz or Avis, its agreement to the formula price would tend to lend support to the demand of the car rental companies that dealers sell at that price and, therefore, constitutes a restraint of trade in violation of § 1 of the Sherman Act. However, we cannot be sure whether the jury's affirmative answer to question 6, finding a "contract, combination or conspiracy . . . which unreasonably restrained interstate trade or commerce in Ford motor vehicles at the retail level" (see Appendix to this opinion), was based on this price-fixing claim or on the claim arising out of the operation of company-owned outlets described above. For this reason, a new trial is required on this claim.

■ Because there will be a new trial on this claim, it is appropriate to comment on defendant's contention that there has been no proof of injury or amount of damages resulting from the alleged price-fixing agreement. On the issue of injury, 22 Ford again relied upon the opinion testimony of Dr. Staelin, who estimated that under competitive market conditions the price the auto rental companies would have had to pay per car was $76. higher than the formula price. Ford contends that this testimony fails to establish its alleged antitrust violation *caused* the alleged loss of revenue, see Deaktor v. Fox Grocery Co., 475 F.2d at 1115, arguing that it was necessary for 22 Ford to show that, absent the alleged price-fixing arrangements Avis and Hertz would have purchased new cars from 22 Ford at a higher price than the formula price. We find this to be an unduly restrictive view of causation under the facts of this case.

The Supreme Court has held that a plaintiff's

"burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4."

Zenith Corp. v. Hazeltine, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571, 23 L.Ed. 2d 129 (1969). The Court in *Zenith* went on to explain its view of causation as follows:

"The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.' Bigelow v. RKO Pictures, Inc., *supra* [327 U.S. 251 (1946)] at 264, [66 S.Ct. (574), at 579, (90 L.Ed. 652)]. See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 377–379, [47 S.Ct. (400), 404–405 (71 L.Ed. 684)] (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561–566, [51 S.Ct. 248, 250–251, 75 L.Ed. 544] (1931)."

*Id.* at 123–124. There is sufficient evidence that the price-fixing agreement between Ford, Hertz and Avis would tend to injure plaintiff's business and

---

29. In a memo to Avis whose purpose was "to confirm the basic procedures of our 1963 Summer Rental Promotion as outlined in discussions between the Ford Division Fleet Sales Department and Avis Rent-A-Car System, Inc.," Ford stated that "[w]e understand that the price you are willing to pay is the dealer's net cost plus one-half of the two per cent holdback plus an additional $50." (PX 228)

that the formula price was lower than the free market price would be.[30] Moreover, Dr. Staelin testified that he could not conclude that the formula price was entirely the result of the buying power of the rental companies, but rather that it seemed to him that the way Ford dealt with Hertz and Avis contributed to the absence of a competitive market. Although there is also some evidence in the record that Hertz and Avis possessed sufficient market power to impose the formula price on retail dealers even without the agreement of Ford,[31] we do not believe that it was of such weight as to have required a jury finding that the price-fixing agreement was not a material cause of 22 Ford's injury.

We therefore conclude that there is sufficient evidence from which a fact finder could find that 22 Ford was injured in its business as a result of Ford's price-fixing agreement with Hertz and Avis and is entitled to recover treble damages under § 4 of the Clayton Act. As to defendant's contentions concerning proof of damages,[32] we need only note that the Supreme Court of the United States has held that in cases where a wrongful act precludes "ascertainment of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions . . . the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.' Story Parchment Co. v. Paterson Co., supra, 561–564; Eastman Kodak Co. v. Southern Photo Co., supra, 377–379."

Bigelow v. RKO Radio Pictures, Inc., supra at 264.

For the foregoing reasons, the district court judgment of May 27, 1972 (filed May 30, 1972), as amended by orders of December 26, 1972 and January 16, 1973, will be vacated and the case will be remanded to the district court for the entry of an order, consistent with this opinion, granting (1) judgment for defendant on the cause of ac-

30. Since the market in new Ford cars was not competitive, both because of the price-fixing agreement with Ford and the buying power of Hertz and Avis, it would be inappropriate to require 22 Ford to show that it could have sold cars to Hertz and Avis at a higher price than the formula price. Ford's reliance on Gottesman v. General Motors Corp., 310 F.Supp. 1257, 1260 (S.D.N.Y. 1970), aff'd on other grounds, 436 F.2d 1205 (2d Cir.), cert. denied, 403 U.S. 911, 91 S. Ct. 2208, 29 L.Ed.2d 689 (1971), is therefore misplaced.

31. The evidence indicates that Hertz and Avis have been able to establish and maintain the formula price for many years, not only for new Fords but also for new cars of other manufacturers, and that this practice of formula pricing goes back to before the date of any of the specific transactions or documents upon which 22 Ford relied to establish the price-fixing arrangement. The evidence also shows that 22 Ford was only one of numerous outlets from which Hertz and Avis could have purchased new Fords and that when those rental companies were unable to obtain cars at the formula price from one Ford dealer, they simply resorted to another.

32. We note that we cannot be certain of how much of the lump sum damages stated by the jury in answer to question 9 was intended to be allocated to the price-fixing claim. We are not bound by the district court's attribution of $34,200. in damages to the price-fixing claim (see note 20, supra). In his testimony Dr. Staelin presented two different estimates of these damages—$34,200. and $90,000. The first figure was obtained by multiplying the $76. differential per car between the formula price and the competitive market price times the number of cars (450) 22 Ford allegedly sold to Hertz and Avis during the relevant period. The second figure is the product of the $76. differential and an estimate of the percentage of fleet sales (5%) that 22 Ford was expected to attain over that period. Although the district court mentioned only the former estimate in its charge, it did not explicitly limit the jury to that figure.

tion for violation of the oral contract, and reserving to plaintiff Rea the right to sue for damages at the appropriate time, if any, in the future;[33] (2) a new trial on the issue of damages on the cause of action for violation of the Automobile Dealers' Act; (3) judgment for defendant on that part of the cause of action under the Sherman Act concerning Ford's operation of its wholly-owned retail outlets; and (4) a new trial on that part of the cause of action under the Sherman Act concerning the price-fixing agreement between Ford and Hertz and Avis.

## APPENDIX TO OPINION OF APRIL 26, 1974 in REA et al. v. FORD MOTOR COMPANY (3d Cir. No. 73–1190)

### SPECIAL VERDICT

In accordance with instructions of the court, the jury hereby finds as follows:

(1) Was there a binding contract between plaintiff, Edward C. Rea, and defendant, Ford Motor Company, whereby Rea would acquire the title to so-called Balison tract of land in Monroeville, Allegheny County, Pennsylvania?

Answer: "Yes".

(2) If your answer to the first question is "yes", what were the terms of the contract?

(a) that Rea was to take title in his own name or in the name of a corporation formed by him and lease the same to defendant, Ford Motor Company, for a term of years with a lease-back from Ford Motor Company to 22 Ford, Inc., Rea's Dealership? (The so-called *direct-lease plan*.)

Answer: "Yes".

(3) Do you find that the defendant, Ford Motor Company, breached its agreement as found by you in your answers to Questions 1 and 2?

Answer: "Yes".

(4) If your answer to Number 3 is "yes", what amount of damages do you award Edward C. Rea for such breach of contract?

Answer: "$29,683.00".

(5) Did the defendant breach its duty *to act in good faith in performance or in complying with any of the terms of the franchise or sales agreement between 22 Ford, Inc. and Ford Motor Company as required by the Automobile Dealers Act?*

Answer: "Yes".

If your answer is "yes", what amount of damages do you award plaintiff, 22 Ford, Inc., for this breach of duty?

Answer: "$350,000.00".

(6) Did defendant enter into any contract, combination or conspiracy which was in effect during the period since February 11, 1964, and which unreasonably restrained interstate trade or commerce in Ford motor vehicles at the retail level in the area covered by the Pittsburgh Sales Office of Ford Motor Company?

Answer: "Yes".

(7) Did the defendant during the period from February 11, 1964, attempt to monopolize interstate trade or commerce in Ford motor vehicles at the retail level in the area covered by the Pittsburgh Sales Office of Ford Motor Company?

Answer: "Yes".

(8) Did the defendant violate Section 3 of the Clayton Act making it unlawful to make a sale or contract for sale of goods or commodities on condition that the purchaser shall not use or deal in goods and commodities of a competitor, *viz*: Oldsmobile automobiles manufactured by General Motors Corporation where the effect was substantially to lessen competition or tend to create a monopoly in any line of commerce?

Answer: "No".

(9) If your answer to either 6, 7 or 8 or any of them is "Yes" what damages

---

33. See page 2733, including notes 5 and 6, above.

did plaintiffs sustain by reason of any such violation of the antitrust laws?

Answer: "$1,750,000.00".

(Signed by the Jury.)

May 25, 1972.

WEIS, Circuit Judge (concurring and dissenting):

I concur with the well reasoned opinion of the majority, except with respect to the entry of judgment in favor of the defendant on Count I. I would affirm the judgment in favor of Rea in the amount of $29,683.00.

Count I is a claim for damages resulting from the breach of an oral contract for the sale of realty. This phase of the litigation is based solely on Pennsylvania law and is in the federal courts only by reason of pendant jurisdiction.

Pennsylvania follows the general doctrine that the corporation is an entity separate and distinct from its stockholders. "It is only when justice or public policy demands it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless that the court will disregard the corporate identity." Fedun v. Mike's Cafe, Inc., 204 Pa.Super. 356, 362, 363, 204 A.2d 776, 780 (1964), aff'd, 419 Pa. 607, 213 A.2d 638. None of these exceptions is presented here.

The contract was executed by Rea as an individual. It is he who has the cause of action for the breach as the jury found in answering special interrogatories. Although Rea holds a majority of the stock in 22 Ford, Inc., he is not the tenant. It is the corporation which holds the lease from Ford.

The rule for which Naftzinger v. Roth, 93 Pa. 443 (1880), is cited has relevancy only to a person in possession. It can be applied to this case only if the legal distinction between Rea and 22 Ford, Inc. is obliterated.

Ford was well aware that Rea did not intend to have the dealership-tenant be the landowner. The defendant was not misled in any fashion, has not shown

any fraud, and is not now entitled to claim that the corporate veil should be pierced.

I find no error in the district court's disposition of Count I, and would affirm its judgment in favor of the plaintiff.