CHINETTI–GARTHWAITE
IMPORTS, INC.

v.

FERRARI SOCIETA PER AZIONI ES-
ERCIZIO FABBRICHE AUTOMOBI-
LI E CORSE.

Civ. A. No. 78–2998.

United States District Court,
E. D. Pennsylvania.

Nov. 30, 1978.

Gary S. Turetsky, David H. Pittinsky, Philadelphia, Pa., for plaintiff.

Robert S. Ryan, Michael O. S. Floyd, William J. Lehane, Philadelphia, Pa., for defendant.

## MEMORANDUM

CAHN, District Judge.

### INTRODUCTION

Plaintiff, Chinetti-Garthwaite Imports, Inc. (CGI), is the importer and distributor for Ferrari automobiles in the eastern part of the United States. Defendant, Ferrari Societa Per Azioni Esercizio Fabbriche Automobili E Corse (Ferrari), is the manufacturer of Ferrari automobiles. CGI alleges that Ferrari violated the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221–1225 (hereinafter the Act), by informing CGI that it would not renew CGI's franchise and then attempting to negotiate another agreement less favorable to CGI.[1] CGI argues that Ferrari used the notice of nonrenewal as a lever to force CGI to accede to Ferrari's wishes and that such an action is the type of coercion which the Act forbids.[2] CGI further alleges that termination of its franchise will cause it irreparable harm and therefore seeks both temporary and permanent injunctive relief.

On September 8, 1978, following notice to Ferrari, I entered a temporary restraining order on CGI's *ex parte* motion. Thereafter, counsel appeared for Ferrari and entered into several stipulations extending the temporary restraining order until November 20, 1978, when a decision on the plain-

---

1. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1337. Venue is properly laid in this district. 28 U.S.C. § 1391(b), (d).

2. The Act gives the dealer a remedy against the manufacturer's failure "to act in good faith . . . in terminating, cancelling, or not re- newing the franchise . . . ." 15 U.S.C. § 1222 and defines good faith as the duty "to act in a fair and equitable manner . . . so as to guarantee . . . freedom from coercion, intimidation, or threats of coercion or intimidation." 15 U.S.C. § 1221(e).

tiff's motion for a preliminary injunction would be made.[3] Discovery has been afforded to both parties.

CGI is entitled to a preliminary injunction if it can show that:

1. It will sustain irreparable harm if the injunction is not granted,

2. On balance, granting the injunction will benefit it more than it will harm the defendant, and,

3. It is likely to succeed on the merits.[4] *Constructor's Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 814–15 (3d Cir. 1978); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975).

CGI has satisfied the first requirement. If the injunction is not granted it will go out of business. As the court of appeals held in *Bateman v. Ford Motor Co.*, 302 F.2d 63 (3d Cir. 1962), loss of a business results in irreparable harm and is the sort of injury for which injunctive relief may be granted. *See Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 513 (10th Cir. 1976). CGI introduced credible evidence that it could not readily become the importer for another manufacturer and would therefore have to go out of business if preliminary relief were not granted. Therefore, it has met its burden of proving that it will be irreparably harmed.

CGI has also satisfied the second requirement. It has shown that maintaining the status quo will benefit it more than it will hurt Ferrari. CGI is operating profitably; its audited financial statements show profits in excess of $700,000 for fiscal year 1978. It expects to double its revenues during the current fiscal year and has received orders for over one hundred more cars than Ferrari can deliver. Indeed, Ferrari is more than one hundred cars behind schedule at the present time. Therefore, it is difficult to see how Ferrari will be harmed by allowing CGI to continue in business pending a final determination of the matter. Ferrari will not go out of business; on the contrary, Ferrari will continue to benefit from CGI's profitability.

CGI has also satisfied the third requirement. It has shown that it has a reasonable likelihood of succeeding on the merits. The Act gives dealers a remedy against manufacturers who bargain in bad faith and defines bad faith as the use of coercion. 15 U.S.C. §§ 1221–1222. This case poses two issues which require further discussion: (1) is CGI a dealer as that term is defined in the Act, and (2) did Ferrari exercise coercion by notifying CGI that its franchise agreement would not be renewed and then entering into contract negotiations with it.

On the first issue I find that plaintiff is a dealer and is subject to the protection of the Act with respect to both its importer and distributor functions.[5] Section 1221(c) provides that the term dealer includes "any . . . corporation . . engaged in the sale or distribution of passenger cars . . . ." Although the Act does not directly address the issue of whether an importer is a dealer, its purpose and legislative history suggest that an importer should be considered a dealer, at least in this case. The House report states that "the manufacturer's obligation to act in good faith extends to all of his franchised dealers, including: dealers who sell automobiles to other dealers . . . for resale to the public . . . ." H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956), *reprinted in* 1956–3 U.S.Code Cong. & Admin.News,

---

3. On October 30, November 6, and November 7, 1978, the court took testimony and heard argument on CGI's motion for a preliminary injunction. On November 20, 1978, the court issued the preliminary injunction which CGI sought and informed the parties that this opinion would be issued during the following week.

4. The fourth requirement, that of public interest, is not really applicable to this case. To the extent that it is, however, it favors CGI since the public interest would not be served by allowing the termination of an ongoing and financially healthy enterprise.

5. I need to decide this issue because if CGI is not a dealer then it could never succeed at a trial on the merits.

pp. 4596, 4604 (hereinafter 1956 USCCAN). CGI buys cars from Ferrari for resale to other dealers; it should therefore be considered a dealer.

The Act's failure to mention importers does not command a different conclusion. First, Congress did not limit the word "dealer" to retail dealers. Instead it specifically provided that a distributor would also be considered a dealer, thereby showing that it wished to extend the benefits of the Act to enterprises which like a dealership, depend on the manufacturer and are therefore subject to coercion by it. 15 U.S.C. § 1221(c). An importer is similar to a distributor in that it depends on the manufacturer for survival. Therefore, importers as well as dealers and distributors need protection from coercion by their manufacturers.

Second, when Congress enacted this legislation it was concerned with the relationship between manufacturers and dealers. 1956 USCCAN, at 4596–99. In examining this relationship it probably had in mind the domestic manufacturer who obviously does not use a United States importer. Therefore, it is not surprising that the Act omits specific reference to importers. Given the policy behind the Act, that omission should not be determinative. To exclude importers from the protection of the Act would be to ignore the congressional concern with righting the imbalance in bargaining power between the manufacturer and those who depend on it for the survival of their businesses. Furthermore, if the Act covered distributors but not importers it would leave the latter enterprises at the mercy of the manufacturer merely because their manufacturer is foreign rather than domestic. The policy behind the statute does not support such an unintended result.

Unfortunately, counsel has not cited, and our independent research has not disclosed, any case precisely on point. The case of *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123 (D.N.H.1975), relied upon by Ferrari, is clearly distinguishable. The plaintiff in *Grappone* tried to establish that the importer was the manufacturer. The court, however, found that unless the importer was controlled by the manufacturer it could not be held liable as a manufacturer.

However, to the extent that *Grappone* shows that a court should look at the nature of the relationship between the parties to determine whether they are subject to the Act, it supports CGI's position. *Accord, Lewis v. Chrysler Motors Corp.*, 456 F.2d 605 (8th Cir. 1972). Under the *Grappone-Lewis* reasoning, if the parties are in the same positions as a dealer and a manufacturer, then the Act should apply. If they are not, then the Act should not apply. This analysis is sound, because it focuses on the relative bargaining power between the manufacturer and its dependents, and that is precisely what Congress was concerned about when it passed the Act. Since Ferrari and CGI are in the same relative positions as a manufacturer and a dealer, the Act should apply to their actions. *Lewis v. Chrysler Motors Corp., supra*; Kessler & Stern, *Competition, Contract, and Vertical Integration*, 69 Yale L.J. 102 (1959); Kessler, *Automobile Dealer Franchises: Vertical Integration by Contract*, 66 Yale L.J. 1135 (1957); Comment, *The Automobile Dealer Franchise Act of 1956—An Evaluation*, 48 Cornell L.Q. 710 (1963). I therefore hold that the Act protects CGI in both its importer and distributor functions.[6]

Deciding the second issue is considerably more difficult. CGI claims that Ferrari issued the notice of nonrenewal in order to force CGI to accept less advantageous terms in a new contract. Ferrari, however, claims that it made a legitimate business decision to change the method of distributing Ferrari automobiles and that the Act should not be used to freeze existing patterns of distribution. Both are compelling arguments. Unlike most of the cases decided under the Act to date, this case illus-

---

**6.** There is no question that the Act applies to CGI in its distributor functions. 15 U.S.C. § 1221(c). *Hoffman Motors Corp. v. Alfa Romeo S.p.A.*, 244 F.Supp. 70 (S.D.N.Y.1965). Therefore, even if I am found to be in error in holding that the Act applies to importers, the part of the injunction which protects CGI in its distributor functions should remain valid.

trates the conflict in the policies underlying the Act: protecting the dealer but preserving the manufacturer's ability to make business decisions. It is a hard case, made even harder by the very able presentations of counsel for both sides.

I realize that for CGI to succeed on the merits a court must extend the law beyond its current state. Most of the litigated cases involve either of two situations: those where the dealer violated a provision in the franchise agreement[7] and those where the manufacturer tried to force the dealer to accept unwanted cars or parts.[8] In the former cases the dealers have usually lost while in the latter they have usually won. This case falls between these extremes.[9] However, I find that on this record the plaintiff has carried its burden of showing that it has a reasonable likelihood of succeeding on the merits.

I base my decision on the following:

## FINDINGS OF FACT

1. Plaintiff, Chinetti-Garthewaite Imports, Inc., is a Delaware corporation with its principal place of business at Paoli, Pennsylvania.

2. The defendant, Ferrari Societa Per Azioni Esercizio Fabbriche Automobili E Corse, is an Italian corporation with its principal place of business in Italy.

3. (a) On or about April 1, 1972, Ferrari and CGI entered into contractual agreements whereby Ferrari gave CGI a franchise to import automobiles manufactured by Ferrari into the United States and to act as distributor within a designated territory, generally east of the Mississippi River.

(b) Thereafter, Ferrari on several occasions enlarged the territory of CGI.

4. (a) The contractual agreements were to terminate on December 31, 1975, but were renewed by Ferrari for the years 1976 and 1977.

(b) Since both parties failed to give notice of nonrenewal within four months of the termination date, the contractual agreements were further extended until December 31, 1978, by their own terms.

5. (a) CGI, in fulfilling its obligations under the franchise arrangement, developed within its territory a network of fifteen dealers.

(b) CGI also developed techniques for providing satisfaction of warranty claims.

(c) CGI, through an affiliated corporation, improved the distribution of parts.

(d) CGI provided an improved program to give technical training and assistance to its dealers.

(e) CGI has given Ferrari no cause for the nonrenewal of the franchise.

---

7. *E. g., Kotula v. Ford Motor Corp.*, 338 F.2d 732 (8th Cir. 1964), *cert. denied*, 380 U.S. 979, 85 S.Ct. 1333, 14 L.Ed.2d 273 (1965); *Garvin v. American Motors Sales Corp.*, 318 F.2d 518 (3d Cir. 1963); *Milos v. Ford Motor Co.*, 317 F.2d 712 (3d Cir.), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963). In other cases the terminations were initiated by the dealer. *Minson Plymouth, Inc. v. Chrysler Motors Corp.*, 554 F.2d 1266 (4th Cir. 1977); *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir. 1975); *Salco Corp. v. General Motors Corp.*, 517 F.2d 567 (10th Cir. 1975).

8. *David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 55 (4th Cir.) *cert. denied* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1974); *American Motors Sales Corp. v. Semke*, 384 F.2d 192 (10th Cir. 1967); *Globe Motors, Inc. v. Studebaker-Packard Corp.*, 328 F.2d 645 (3d Cir. 1964); *Martin Motor Sales, Inc. v. Saab-Scania of America, Inc.*, 452 F.Supp. 1047 (S.D.N.Y.1978); *Don*

*Richards Lincoln Mercury Jeep, Inc. v. American Motors Corp.*, 1976–1 Trade Cases, ¶ 60,-796 (D.Utah 1976).

9. The cases that provide the greatest support for plaintiff's position are distinguishable because in all of them the manufacturer's threat was overt and quite unmistakable. *Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974) (manufacturer threatened to stop shipping cars to dealer unless dealer's stockholder relinquished interest in another dealership); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970) (distributor terminated when it refused to lower resale price; *Volkswagen Interamericana, S. A. v. Rohlsen*, 360 F.2d 437 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966) (dealer terminated when it would not become the manufacturer's partner). In this case, however, the manufacturer cleverly attempted to veil its threat, undoubtedly to avoid the result that befell the manufacturers in those cases.

(f) In the last two years CGI and its dealers have been able to sell more automobiles than Ferrari can supply.

(g) CGI has recently become highly profitable. It posted a net income from operations of $708,472 in fiscal 1978 and $675,271 in the first six months of fiscal 1979. Due to a design problem prior years were much less successful.

6. Prior to 1978 Ferrari began to consider whether it or Fiat Motors of North America, Inc. (FMNA),[10] should assume the importation and distribution functions which CGI was fulfilling.

7. In early 1978 Ferrari decided to give notice of nonrenewal of the franchise agreement to CGI.

8. On May 16, 1978, Gary Rodriguez, who at all times pertinent to this dispute was acting on behalf of Ferrari, gave notice to CGI that the franchise agreements would not be renewed and therefore would terminate on December 31, 1978. This notice was thereafter confirmed by certified letter as required by the terms of the franchise agreement.

9. Immediately after giving the aforesaid notice, Rodriguez presented CGI with a draft of a new contract which would materially decrease the financial returns anticipated by CGI.

10. Other findings of fact are made in the Introduction and Discussion sections of this Memorandum and are incorporated here by reference.

## DISCUSSION

 At this stage of the proceedings, I find that the plaintiff has shown a reasonable likelihood of proving that:

1. Ferrari, through Rodriguez, coerced CGI by first giving notice of nonrenewal and then presenting a nonnegotiable proposal designed to maximize Ferrari's profit at the CGI's expense.

2. Ferrari exercised this coercion in bad faith because it attempted to use the nonrenewal notice as a lever to pressure CGI into accepting a contractual arrangement which would immediately eliminate it as an importer and later lead to its elimination as a distributor.[11]

Although Ferrari would have us believe otherwise the evidence shows that Ferrari did not simply decide to terminate its relationship with CGI.[12] Had this been all that occurred perhaps Ferrari would be correct in its assertion that *Berry Brothers Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542 (E.D.Pa.1966), aff'd per curiam, 377 F.2d 552 (3d Cir. 1967), and *Ship & Shore Motors, Inc. v. British Leyland Motors, Inc.*, 1974–1 TRADE CASES ¶ 75,102 at p. 96,903 (D.N.J.1974), support a denial of CGI's motion for a preliminary injunction. *See Marquis v. Chrysler Corp.*, 577 F.2d 624 (9th Cir. 1978). However, the record contains ample evidence that unlike *Berry Brothers* and *Ship & Shore* this is not a case of arbitrary nonrenewal or of an attempt to accommodate a dealer by trying to work out an alternative arrangement after a firm decision to terminate has been made. In this case the manufacturer deliberately sought to put itself in a position where it would "give up as little as possible and yet avoid litigation." Exhibit P–5 (Mailgram from Gary Rodriguez to Piero Fusaro, a Ferrari official in Italy); Trial Transcript at 23.

---

10. The record shows without contradiction that Fiat of Italy owns FMNA and also owns fifty percent of Ferrari.

11. When a manufacturer uses its power to terminate at dealer's franchise as bargaining leverage it is doing precisely what the Act forbids. That the franchise agreement permits arbitrary termination is irrelevant; Congress intended that the Act provide a remedy irrespective of contractual provisions. 1956 USCCAN at 4596. *See York Chrysler-Plym-*

*outh Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir. 1971).

12. Indeed Ferrari considered the effect of rescinding the notice of nonrenewal and thought that doing so might even be advantageous because it would force the distributors to "work feverishly to avoid criticism by Ferrari leading toward cancellation for lack of performance." Exhibit P–5, Transcript at 32. That is not the statement of someone who had made a firm decision to terminate a dealer.

The following colloquy unequivocally establishes this:

[Question to Gary Rodriguez, called by plaintiff as of cross-examination]:

Q: So that by beginning the negotiations with a notice of non-renewal, you felt that the only choice that the distributors would have is to have nothing because of the notice of non-renewal or the best deal they could make with you as the representative of Ferrari, is that correct?

. . . .

A: Yes, I suppose. That's not exactly the way I had it in my mind, but that's essentially the thrust of it.

Trial Transcript at 33–34.

██ Mr. Rodriguez's testimony establishes that Ferrari deliberately chose to begin its negotiations with the notice of nonrenewal so that CGI would have little choice but to accept whatever terms Ferrari offered. It is significant that the terms which Ferrari proposed were much more favorable to Ferrari than to CGI. Courts recognize that the Act allows a manufacturer to pressure a dealer into improving his performance or instituting some change that will benefit both the dealer and the manufacturer. *Volkswagen Interamericana S. A. v. Rohlsen*, 360 F.2d 437, 442 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). Thus, the court of appeals has held that a finder of fact should consider not only whether one party brought pressure to bear on the other, but for what reason it did so. *Rea v. Ford Motor Co.*, 497 F.2d 577 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *accord, Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2d Cir. 1970). However, this is not a case of a manufacturer trying to nudge a marginal dealer into improving his performance. This is a case of a manufacturer trying to reduce a successful dealer's profit in order to increase its own. Since Ferrari put pressure on CGI so that it would accede to terms that would benefit only Ferrari, CGI has shown that there is a reasonable likelihood that it will be entitled to relief under the Act. *See* Hearing Transcript at 23, 24.

Ferrari has argued that allowing CGI to prevail means that a manufacturer's initial agreement with a dealer forms a marriage from which there can be no divorce. This result, it argues, has been rejected by the courts. *See Bateman v. Ford Motor Co.*, 302 F.2d 63, 66–67 (3d Cir. 1962). However, my decision does not reach this result. First, I am deciding only that CGI has shown that it has a *reasonable likelihood* of succeeding on the merits. I have not decided that it will succeed. The parties remain free to present additional evidence and legal argument at trial.

██ Second, the result is consistent with congressional intent. Rather than creating divorceless marriages the Act protects an innocent spouse (in this case an efficient dealer) from undue pressure and coercive practices. If CGI prevails on the merits at a final hearing for a permanent injunction, it does not mean that manufacturers may never terminate dealers. It merely means that manufacturers may not use the threat of termination to enhance their bargaining position. Thus, manufacturers may simply terminate an inefficient dealer with whom they wish to have no further relationship at all. However, if a manufacturer wants to retain the dealer on some revised basis, it may not use the threat of termination to secure a bargaining advantage. Nor can a manufacturer, as Ferrari did here, terminate a franchise and then renegotiate with the franchisee using the possibility of reinstatement to pressure the franchisee into accepting an arrangement less advantageous than the original. This result is economically efficient and is precisely what the Act intended. It protects the efficient dealers (like CGI) whom the manufacturer would not want to terminate outright but would want to continue to use in some capacity; it also leaves the manufacturer free to terminate inefficient dealers.

After balancing the relevant factors, I hold that CGI is entitled to the preliminary injunction that it seeks. CGI has proved that without the injunction it will be irrepa-

rably harmed while Ferrari will not be harmed and has shown that it is likely to succeed on the merits. CGI has therefore fulfilled the requirements for receiving preliminary injunctive relief.