IMPERIAL MOTORS, INC. and
Milton A. Flynn

v.

CHRYSLER CORPORATION.

Civ. A. No. 79–1447–Z.

United States District Court,
D. Massachusetts.

March 25, 1983.

---

Michael J. Flynn, Boston, Mass., for plaintiffs.

Samuel Adams, Samuel J. Armstrong, Karen J. Bloom, Warner & Stackpole, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiffs, formerly the operators of a Chrysler-Plymouth franchise in Myrtle Beach, South Carolina, filed this action on July 24, 1979, alleging that defendant, an automobile manufacturer, had violated the Dealers' Day in Court Act (the "Act"), 15 U.S.C. §§ 1221–5 by breaching the terms of the franchise agreement between the parties and by later constructively terminating that agreement. On December 21, 1982, defendant moved for summary judgment, principally on the ground that plaintiffs had failed to state a cause of action. Plaintiffs thereupon moved to amend their complaint so as to allege additional facts supporting their claim of illegal termination. For the reasons stated below, defendant's motion is allowed in part and plaintiffs' motion is denied.

The facts, when viewed in the light most favorable to the plaintiffs, are as follows. In November 1974, plaintiff Milton A. Flynn ("Flynn") and one other person purchased all the stock in plaintiff Imperial Motors, Inc. ("Imperial") from Ray Evans ("Evans"). The purchasers conveyed a promissory note to Evans which was secured by Imperial's stock. In 1976, Flynn, who at that time owned 70% of Imperial's

stock [1] and was its president, entered on Imperial's behalf into Direct Dealer Agreements for Chrysler and Plymouth dealerships with the defendant. Although the Direct Dealer Agreements explicitly provided that Imperial would have "the non-exclusive right" to purchase for resale defendant's cars in Myrtle Beach, Little River, North Myrtle Beach, and Murrells Inlet, defendant's Area District Manager John Molinari ("Molinari") told Flynn that Imperial's Chrysler-Plymouth dealership would be the only one in these four towns.

In August 1976, defendant allowed Carroll Motors ("Carroll"), another Chrysler-Plymouth dealer, to move its dealership from Conway, South Carolina, to a new showroom seven miles away from Imperial's location. When Flynn complained that this relocation would damage his business, he was told by Molinari that "they had plans for me that would make it much, much more desirable to continue to do business with them than to fight them."

In early 1977, Chrysler Credit Corporation, defendant's wholly-owned subsidiary, reduced plaintiffs' line of credit for floor plan models from approximately $250,000 to approximately $170,000. This credit reduction prevented plaintiffs from ordering new and potentially popular models for their showroom. Defendant's representatives met with Flynn and told him that if he would invest more capital in his business, they would increase his line of credit. When Flynn was unable to secure a loan, he offered the dealership for sale. Because he received no satisfactory offers, Flynn conveyed Imperial's stock and property back to Evans, whereupon Imperial ceased its operations.

Defendant's motion for summary judgment is predicated on two grounds. First, defendant argues that Flynn [2] does not have standing to file suit under the Act. Second, it contends that neither plaintiff has made out a cause of action.

15 U.S.C. § 1222 in relevant part provides: "An automobile dealer may bring suit against any automobile manufacturer ... and shall recover the damages by him sustained and the cost of the suit by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer." 15 U.S.C. § 1221 defines an "automobile dealer" as "any person, partnership, corporation, association, or other form of business enterprise ... operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks or station wagons." Defendant argues that because Imperial, not Flynn, entered into the Direct Dealer Agreements with it, Flynn has no standing to sue under § 1222.

In general, when a corporation is injured, only the corporation, a receiver, or a stockholder suing derivatively in the corporation's name may sue to redress the injury. *Vincel v. White Motor Corporation,* 521 F.2d 1113, 1118 (2d Cir.1975). The theory behind this rule is that if the corporation recovers its losses, all its stockholders will benefit through an increase in the value of their stock. *Id.* In certain cases, however, an individual, not a party to a franchise agreement, has been held to have standing to sue under the Act where his participation in a dealership's operation was mentioned in and explicitly deemed essential by the franchise agreement and/or where he was the corporate dealership's principal shareholder. *Rea v. Ford Motor Company,* 497 F.2d 577 (3d Cir.1974), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir.1971). In addition, allowing an individual operating a corporate dealership to proceed on his own behalf is appropriate where denying him standing "would have ... the effect of

---

1. Flynn later purchased the remaining 30%, thus becoming the sole shareholder.

2. Although Imperial is named as a plaintiff, it is at best a nominal party since it is unrepresented by separate counsel and there has been no showing that Flynn or his attorney is authorized to proceed on its behalf.

negating the protective features of the Act altogether." *Vincel v. White Motor Corporation,* 521 F.2d at 1120, discussing *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965).

■ Flynn was Imperial's principal if not sole shareholder, and defendant relied on his "active, substantial and continuing personal participation" in the corporation's management as noted in the Direct Dealer Agreements. His chief contention is that defendant's actions forced him to default on obligations under which his stock in the corporate dealership was secured. Under such circumstances, it is unlikely that the corporation, now inoperative and in a third party's possession, would ever on its own pursue claims against defendant. Assuming that a violation of the Act has occurred, acceptance of defendant's argument would, therefore, remove the protections of the Act from the type of dealer who needs them most—one upon whom the impact of coercive action has been so great as to force him completely out of business. I hold, therefore, that Flynn has standing to maintain this action.

■ Defendant's motion for summary judgment is proper as to that part of plaintiffs' claim which alleges that defendant's approval of Carroll's relocation was a violation of the Act. The Act covers only those actions of a franchisor which amount to a "failure . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with a dealer." 15 U.S.C. § 1222. Good faith is narrowly defined as "the duty of each party . . . to act in a fair and equitable manner toward each other so as to guaranty the one party freedom from coercion, intimidation or threats of coercion or intimidation by the other party. 15 U.S.C. § 1221. The failure to abide by the terms of a franchise agreement cannot by itself constitute a violation of the act. *Globe Motors, Inc. v. Studebaker-Packard Corporation,* 328 F.2d 645 (3d Cir.1964). Moreover, the Act explicitly defines a franchise as a "written agreement"; accordingly, oral promises are not part of a franchise agreement and cannot form the basis of a claim of bad faith. *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corporation,* 461 F.2d 608 (7th Cir.1972), *cert. denied,* 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972).

■ Constructive termination may serve as the basis for a violation of the Act if it is the result of actions taken by a manufacturer with the intent to intimidate, threaten or coerce. *American Motors Sales Corporation v. Semke,* 384 F.2d 192 (10th Cir.1967). Although defendant contends that the documents filed by the plaintiffs "are completely devoid" of allegations or evidence that it engaged in any wrongful actions which coerced or intimidated plaintiffs into terminating their dealership, Flynn stated at his deposition that after he vigorously protested the relocation of Carroll's franchise, he was told he would be better off not arguing with defendant. Flynn also stated that defendant favored Carroll's more modern dealership to his and that the subsequent reduction of his line of credit was part of an attempt to discipline him into submission. While defendant is correct that the franchise agreement did not guarantee plaintiffs a particular line of credit or a particular inventory, where constructive termination is concerned, "[t]he Act is not as concerned with what the parties did as it is concerned with why they did it." *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d at 791–2. Whether the reduction of plaintiffs' line of credit and plaintiffs' resultant inability to secure new models were prompted by defendant's desire to intimidate plaintiffs is, therefore, a material issue of fact which is genuinely disputed. Although Flynn's deposition and plaintiffs' answers to interrogatories indicate that plaintiffs' case is far from compelling, it is the task of a court considering a motion for summary judgment to " 'look at the record . . . in the light most favorable to . . . the party opposing the motion' [and] indulge all inferences favorable to [that] party." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976) (quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 758 (1962)). When seen in this light, the affidavits, interrogatories and

deposition submitted do provide "some indication that [plaintiffs] can produce the requisite quantum of evidence to enable [them] to reach the jury with [their] claim." *Id.* at 468, 82 S.Ct. at 488.

Perhaps anticipating difficulties in persuading a jury that their line of credit was reduced as a result of defendant's desire to intimidate them, plaintiffs have moved to amend their complaint to state at least seven additional ways in which defendant sought to intimidate plaintiffs and force them out of business. In particular, defendant and its subsidiary Chrysler Credit Corporation are alleged to have deliberately delayed payments to Imperial for warranty work and parts, to have arbitrarily refused to purchase a high proportion of Imperial's credit contracts, to have forced Imperial to hire a friend of Chrysler Credit Corporation's manager, to have arbitrarily terminated Imperial's daily rent-a-car business, to have arbitrarily rejected many of plaintiffs' warranty claims, and to have deliberately delayed shipments of new cars. In addition, plaintiffs seek to add two causes of action under state law.

The proposed amendments were filed nearly four years after commencement of the action, after several pretrial conferences at which the court and the parties defined the issues, and after completion of discovery respecting the issues defined. They would significantly expand the case and require defendants to reopen discovery. No justification is provided for plaintiffs' delay in seeking to amend. Plaintiffs do not indicate that their motion is prompted by newly discovered facts or law. Indeed, at his deposition Flynn explicitly denied that plaintiffs' claim in any way included the termination of Imperial's rent-a-car business and he responded negatively to a question inquiring whether he recalled "any other actions that are different from the ones we have already talked about that you feel were improperly done to Imperial or you." When asked on interrogatories to set forth all facts upon which it based its claim of illegal termination, Imperial did not include any of the factual allegations mentioned in the proposed amendment. In these circumstances, amendment of the complaint would result in undue prejudice to defendant and delay of this litigation.[3]

Defendant's motion for summary judgment is allowed as to that part of plaintiffs' case that alleges that the relocation of Carroll was a violation of the Act. Defendant's motion is denied as to that part of plaintiffs' case that alleges constructive termination. Plaintiffs' motion to amend is denied.[4]

3. Paragraph 11(c) of the proposed amended complaint alleges that: "After placing Imperial in financial difficulty ... Chrysler caused its subsidiary, Chrysler Credit, to demand that Milton Flynn invest an additional $70,000 into the business or have his floor plan financing cut back, knowing that Milton Flynn could not invest additional funds. Thereafter, Chrysler Credit in fact cut back Imperial's floor planning in an arbitrary and discriminating fashion, at a time calculated to cause maximum damage to Imperial." Because this issue was mentioned by Flynn at his deposition, treating it as part of plaintiffs' constructive termination claim would not be unfair to defendant. Accordingly, even though plaintiffs' motion to amend will not be granted, the reduction in plaintiffs' credit line is properly an issue for trial and may be subsumed under the initial complaint.

4. The denial of plaintiffs' motion renders unnecessary a ruling on defendant's motion to strike Flynn's supporting affidavit.