Edward **WAHSNER**, et al.

v.

**AMERICAN MOTORS SALES CORP.**, et al.

**Civ. A. No. 83–1216.**

United States District Court, E.D. Pennsylvania.

Oct. 23, 1984.

Michael O'S. Floyd and James C. Ingram, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

Anthony J. Sciolla, Jr., Philadelphia, Pa., for plaintiffs.

## MEMORANDUM

GILES, District Judge.

Edward Wahsner and Stevin Novin filed this action against American Motors Sales Corporation (AMSC) and Rich Will, an AMSC Zone Manager, under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (Dealers' Day Act). They allege AMSC terminated them in bad faith in violation of the Dealers' Day Act. They also allege that Will induced AMSC to breach its franchise agreement with plaintiffs.[1] AMSC and Rich Will have filed a motion for summary judgment asserting that Wahsner and Novin signed releases in which they relinquished all claims against defendants. For the reasons which follow, this motion shall be denied.

## FACTS

On April 15, 1978, Wahsner and Novin were installed as co-investors/operators of the dealership, Economy AMC/Jeep, Inc. (Economy) as part of AMSC's dealership investment program. Wahsner and Novin each invested $25,000 for a total of $50,000. AMSC invested $75,000. First Pennsylvania Bank provided the remainder of Economy's capital in the form of a loan in the amount of $125,000 guaranteed by AMSC.[2] Wahsner and Novin each signed an employment agreement. These agreements provided that AMSC employed Wahsner as president and general manager of Economy and Novin as vice-president and co-manager of Economy. Both employment agree-

ments were terminable at will at any time by the board of directors or by voluntary resignation. Wahsner and Novin also each signed a stock agreement which provided that AMSC owned 750 shares (all of the issued and outstanding shares) of preferred stock and that Wahsner and Novin each owned 250 shares of the common stock. An addendum to the stock agreement provided that in the event Novin and/or Wahsner ceased to be officers of Economy, AMSC had the right to purchase their stock at book value or to liquidate the dealership. According to the investment plan, profits clear of all encumbrances were to be applied to the redemption of outstanding preferred stock. If all worked well, all of the outstanding preferred stock eventually would be redeemed and Wahsner and Novin would become the sole owners of the dealership. The document entitled "Dealer Franchise Provisions" allowed AMSC to terminate the dealer for failure to conduct business in accordance with each of the requirements set forth earlier in the document by giving written notice at least ninety days prior to the date of termination.

Wahsner and Novin operated Economy for approximately three years. At some point or points during these three years, Economy was listed in AMSC's top ten dealer list.[3] After operating at a profit for the first six months, Economy began to operate at a loss and this loss trend was never reversed. In February, 1980, W.R. Crawford, who was responsible for running AMSC's dealership investment program and was Economy's first vice president, recommended that Economy's loan be recapitalized. This recapitalization increased First Pennsylvania Bank's loan to $150,000[4] and required AMSC to provide a new capital loan guarantee to the First Pennsyl-

---

1. It appears from the complaint that the claim against Will is based on pendent jurisdiction. Plaintiffs seem to be asserting that Will tortiously interfered with the contractual agreement between them and AMSC. Such a claim is grounded in state law and not the Dealers' Day Act.

2. According to Novin, he and Wahsner personally guaranteed the loan as well.

3. The record is unclear on exactly when Economy was listed in the top ten dealer list.

4. By February, 1980, the current balance on the First Pennsylvania loan had been reduced to $71,500.

vania Bank. In July, 1980, Crawford recommended another recapitalization of Economy, this time in the amount of $124,-000. Because First Pennsylvania Bank had participated in the February, 1980 recapitalization of Economy, Crawford proposed that the July, 1980 recapitalization be totally funded by AMSC, and so it was.

In intracompany correspondence to Crawford, M.P. Mauricio, the Northeast Branch Manager of the Dealer Investment Department, diagnosed Economy's problems as including (1) ineffective management of employees, (2) a decrease in departmental sales while departmental expenses increased, (3) frozen capital and (4) poor documentation of costs. On March 10, 1981, Crawford recommended in intracompany correspondence that Wahsner and Novin be removed as officers of Economy and that their stock interest be dissolved. He stated that "[t]he primary reason for this recommended course of action is excessive and escalating losses of the dealership due to the continued lack of management action to coordinate and improve the overall operation." He also stated that there had been numerous meetings to work with Wahsner and Novin to improve operation of Economy. However, these attempts to reverse the loss trend had proven unsuccessful. Crawford included "a chronology of the attached dealership contact reports, intercompany memos, audits and letters substantiating this request for removal." Wahsner and Novin had invested $50,000 in common stock in 1978. Between April, 1978 and January, 1981, the dealership accumulated losses amounting to $104,880. Thus the decision was made to remove Wahsner and Novin from the Economy dealership.

On March 15, 1981, Crawford sent mailgrams to Wahsner and Novin which read in pertinent part:

> You are hereby notified that, at the request of Mr. H.C. Cleary and myself as director of Economy AMC Jeep, Inc., a special meeting of the board of directors of that corporation will be held on Wednesday, March 18, 1981 ... for the purpose of reviewing continuing losses and to implement appropriate actions with respect to the future management of Economy. ....

On March 18, 1981, Novin drove both himself and Wahsner to the meeting in a car owned by the dealership. On the way to the meeting, they stopped by Economy where they discovered that the locks were being changed. Although they found the changing of the locks strange, neither this nor the mailgram indicated to them that their resignations would be requested at the meeting.

Present at the meeting were Crawford, Will, Herbert C. Cleary, the new branch manager, Wahsner and Novin.[5] Once the meeting began, Crawford informed Wahsner and Novin that the board was requesting their resignations because it was not satisfied with their operation of Economy. Both Wahsner and Novin were flabbergasted by the request and refused to resign. Upon their refusal, Crawford told them that if they did not resign, the board would remove them and they would leave the meeting with absolutely nothing. They still refused to resign. The board then offered them $5,000.00 cash settlement, two weeks severance pay, two weeks vacation and use of the company car. After they refused this offer, Crawford recommended to Wahsner and Novin that they talk it over. Crawford and the others present left the room so that Wahsner and Novin could talk privately. During their private discussion, Wahsner and Novin decided they should resign. In deposition testimony Wahsner and Novin stated they interpreted Crawford's statement that they would leave with absolutely nothing if they did not resign as meaning that they would have to walk home because they had arrived in a company car. Novin also claimed

<hr />

5. Although Will was not a member of the board of directors, he was allowed to attend because he had recommended approval of their application to the dealer investment program. The board members for Economy were Crawford, Cleary and Wahsner. However, Wahsner was a non-voting member.

during deposition that he felt under great pressure and powerless to fight the board. He believed that if they did not resign, it would be difficult to find work elsewhere. He also stated during his deposition that he could not risk losing whatever security was being offered because he had a family to support and a child with a heart ailment requiring medical attention and hospitalization. Before actually resigning, however, they agreed that they would make sure that they would each receive the $5,000.00, letters of recommendation and continued hospitalization.

After about twenty minutes, Crawford and the others rejoined Wahsner and Novin. Crawford reassured them that they would each receive $5,000.00 and agreed to the letters of recommendation and continued hospital coverage. Wahsner and Novin then tendered their resignations. Wahsner refused to sign his release until after he had received his check. Both Wahsner and Novin returned with Crawford and Cleary to the dealership to obtain their checks. Each received checks in the amount of $8,184.58 (two weeks severance pay plus $5,000.00 less withholding taxes), two weeks plus three days of vacation pay, continuation of medical insurance until March 31, use of the company cars until April 30 and a letter of recommendation. In return, Wahsner and Novin executed letters of resignation, assignments of stock, waivers of certain rights under the stock agreements and general releases.[6] Neither Wahsner nor Novin returned any of the consideration they received from defendants.

---

6. The releases provided:
   For the sum of One Dollar ($1.00) and other valuable consideration, the receipt and adequacy of which is hereby acknowledged, [Wahsner/Novin], the undersigned, has remised, released and forever discharged, and by these presents, does for himself, his heirs, executors, administrators, successors and assigns, remise, release and forever discharge American Motors Corporation, American Motors Sales Corporation, Economy AMC/Jeep, Inc., their agents, employees, successors and assigns, of and from all manner of actions, causes of action, suits ... claims and any and all demands whatsoever, in law or in equity,

After Wahsner and Novin resigned, Dick Gorham took over the dealership. Later, Rich Will took over and the dealership was given a new name.

## SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56 allows summary judgment to be granted,

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981); *see also Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). Doubts as to the existence of genuine issue of fact must be resolved against the moving party. *Continental Ins. Co.,* 682 F.2d at 438, *quoting Hollinger,* 667 F.2d at 405. Any "inferences ... drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." *Id.*

## DISCUSSION

The Dealers' Day Act allows "automobile dealers" to bring actions in federal court against automobile manufacturers who have not acted in good faith in performing the provisions of the franchise or in terminating the franchise. 15 U.S.C. § 1222.[7] Wahsner and Novin alleged that

---

which the said [Wahsner/Novin] ... may at any time have or have had ....

7. Although technically plaintiffs were AMSC employees rather than "automobile dealers," they have standing to bring this action under the Act, a fact which AMSC does not dispute. Courts routinely hold that individuals like plaintiffs—that is individuals who have invested substantial sums in the dealership, who have purchased non-voting stock with the manufacturer holding the voting stock and who have contracted to become the sole owners of the dealership if they operate it at a profit over a period of years—have standing to sue under the Act. *See Rea v. Ford Motor Co.,* 497 F.2d 577, 584 (3d

AMSC acted in bad faith when it terminated them. As evidence of this bad faith they point to the lack of notice, their lack of alternatives, the short amount of time in which they were allowed to make their decision and the abrupt manner in which they were treated at the meeting. AMSC counters that it did not terminate the franchise, which continued to operate under another's supervision. Rather, AMSC presented Wahsner and Novin with two choices—resign and sign the release in exchange for certain benefits or face immediate termination and receive nothing. Wahsner and Novin were no more than at will employees and thus they received more than they were entitled to receive when they signed their releases in exchange for the already enumerated benefits. Since the Act requires good faith in the termination of franchises and here the franchise was not terminated, AMSC argues that it did not violate the Act. Moreover, under Pennsylvania law, defendants contend Wahsner and Novin executed valid releases, releasing both AMSC and Will, which should be enforced by this court.

> The Dealers' Act defines good faith as: [T]he duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e). The good faith inquiry centers on whether the manufacturer is guilty of coercion or intimidation. *See Francis Chevrolet Co. v. General Motors Corp.,* 602 F.2d 227, 229 (8th Cir.1979),

*citing Milos v. Ford Motor Co.,* 317 F.2d 712 (3d Cir.), *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963); *Pierce Ford Sales, Inc. v. Ford Motor Co.,* 299 F.2d 425 (2d Cir.), *cert. denied,* 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962); *Globe Motors, Inc. v. Studebaker-Packard Corp.,* 328 F.2d 645 (3d Cir.1964). In determining whether the manufacturer acted in good faith, one must examine not only what the manufacturer did, but also the reasons for its actions. *See Rea v. Ford Motor Co.,* 497 F.2d 577, 585 (3d Cir.), *cert. denied* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). For example, a manufacturer does not breach its duty to act in good faith when it terminates a dealer's franchise because of the dealer's failure to fulfill its reasonable obligations under the terms of operation of the dealership. *See Rea,* 497 F.2d at 585; *Milos,* 317 F.2d at 716 (quoting the House Report). Thus, termination in and of itself is not necessarily an act of bad faith. *Milos,* 317 F.2d at 716. As has been observed, there is a "conflict in the policies underlying the Act: protecting the dealer but preserving the manufacturer's ability to make business decisions." *Chinetti-Garthwaite Imports, Inc. v. Ferrari Societa Per Azioni Esercizio Fabbriche Automobili E Corse,* 463 F.Supp. 73, 77 (E.D.Pa.1978).

Given these legal principles, defendants' argument appears rather attractive at first glance. In opposing the motion for summary judgment Wahsner and Novin have relied upon the allegations of the complaint and their deposition testimony that there was a course of conduct by AMSC, designed to drive them out of business. They have not filed documents to specifically dispute those filed by defendants.[8] On the other hand, there is con-

---

Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786, 790–91 (5th Cir.1971); *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965); *Imperial Motors, Inc. v. Chrysler Corp.,* 559 F.Supp. 1312, 1314–15 (D.Mass.1983). *Cf. Vincel v. White Motor Corp.,* 521 F.2d 1113, 1119–20 (2d Cir.1975); *Moorehead v. General Motors Corp.,* 442 F.Supp. 873

(E.D.Pa.1977). Holding otherwise would effectively negate "the protective features of the Act." *Imperial Motors,* 559 F.Supp. at 1314–15, *quoting Vincel,* 521 F.2d at 1120.

**8.** Plaintiffs have the burden of showing absence of good faith by the manufacturer. *Milos,* 317 F.2d at 718, *quoting* S.Rep. No. 2073, 84th Cong.,

siderable evidence supporting AMSC's contention that the franchise was operating at a loss under Wahsner and Novin; that agents of AMSC attempted, without success, to work with Wahsner and Novin and reverse the loss trend, that the franchise had to be recapitalized twice and that Wahsner and Novin were unable or unwilling to do whatever was necessary to operate a profitable franchise. Consequently, the record evidence indicates generally that AMSC's decision to terminate Wahsner and Novin was probably made in good faith. Nevertheless, a material issue of fact yet exists as to whether AMSC carried out this termination decision in good faith.

The mailgram informing Wahsner and Novin of the meeting can hardly be characterized as advance warning that AMSC planned to terminate them. It merely indicated that they would be "reviewing continuing losses and ... implement[ing] appropriate actions with respect to the future management of Economy ..." In addition, Wahsner and Novin were not provided the opportunity to consult counsel or given much more than twenty minutes to ponder and decide whether to execute a release or find alternatives. These were decisions which could affect the rest of their economic lives. In cases where releases have been found valid under the Dealers' Day Act, the parties were represented by counsel when the release was negotiated or the issue of the validity of the release was decided by a jury. *See Olson Motor Co. v. General Motors Corp.,* 703 F.2d 284 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 240, 78 L.Ed.2d 231 (1983) (question of release's validity submitted to jury); *Fabert Motors, Inc. v. Ford Motor Co.,* 355 F.2d 888 (7th Cir.), *cert. denied,* 384 U.S. 939, 86 S.Ct. 1462, 16 L.Ed.2d 539 (1966) (plaintiff acted with counsel's advice and negotiations concerning plaintiff's resignation and the release were conducted over a period of months during which several offers and counter offers were made); *Schmitt-Norton Ford, Inc. v. Ford Motor Co.,* 524 F.Supp. 1099 (D.Minn.1981) *aff'd,* 685 F.2d

438 (8th Cir.1982) (plaintiff consulted counsel before signing the release).

■■■ Under Pennsylvania law, the conditions under which Wahsner and Novin signed the releases may constitute duress. Pennsylvania law is the appropriate law to apply here with respect to the validity of the releases. The Third Circuit held in *Three Rivers Motor Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975) that Pennsylvania law applied in determining whether a release signed by the parties barred plaintiff's antitrust claim. The court reasoned that "[s]tate law customarily governs the field of contracts and [consequently] it is to state law rather than federal law that private parties are likely to refer when formulating the terms of a contractual release." *Id.* at 891 (citation omitted). The court also determined that Pennsylvania law was "not incongruous with federal antitrust objectives." *Id.* at 892 (footnote omitted). Under Pennsylvania law, the intention of the parties governs in the construction of releases and this intention must be determined from the language of the release. *Id. See also Young v. Robertshaw Controls Co.,* 430 F.Supp. 1265, 1268 (E.D.Pa. 1977), citing *Frank v. Volkswagenwerk, A.G. of West Germany,* 382 F.Supp. 1394 (E.D.Pa.1974), *modified on appeal,* 522 F.2d 321 (3d Cir.1975). The signed release binds "the parties unless executed and procured by fraud, duress, accident or mutual mistake." *Three Rivers,* 522 F.2d at 892. *See also Young,* 430 F.Supp. at 1268; *Dorenzo v. General Motors Corp.,* 334 F.Supp. 1155, 1156 (E.D.Pa.1971), *appeal dismissed,* 474 F.2d 1339 (3d Cir.1973), *quoting Mannke v. Benjamin Moore & Co.,* 375 F.2d 281, 285 (3d Cir.1967). Thus, releases that are executed due to fraud, duress or the like are voidable under Pennsylvania law. Moreover, the Dealers' Day Act does not prohibit parties from entering into releases in which they relinquish their Dealers' Day claims. *Schmitt-Norton Ford,* 524 F.Supp. at 1104–05. *See Olson Motor Co.,* 703 F.2d at 286; *Fabert Motors, Inc.,* 355 F.2d at 890–91. This court

2d Sess. (1956) and *citing* 102 Cong.Rec. 14071

(1956) (remarks of Representative Celler).

therefore concludes that Pennsylvania law on the validity of releases is not incongruous with the Dealers' Day Act.

■ Generally, "under Pennsylvania law where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm." *Three Rivers*, 522 F.2d at 893, *citing Carrier v. Wm. Penn Broadcasting Co.*, 426 Pa. 427, 430–31, 233 A.2d 519 (1967) (footnote omitted). Taking as true Wahsner's and Novin's deposition testimony, as is required in deciding a summary judgment motion, there is a material question of fact as to whether they were free to leave and consult counsel. Both testified, during their respective depositions, that they were told that if they did not resign during the meeting, they would leave with absolutely nothing.[9] They could have understood this statement to mean that they had to resign or actually walk home. Although they were permitted to discuss the matter by themselves, there is no indication that they had access to a telephone with which to call a lawyer. That they may have negotiated, without the assistance of counsel, more benefits than were originally offered does not negate the fact that they may not have been provided with the opportunity to consult counsel. With counsel, they may have received even better benefits or decided not to resign and sign the release after having been apprised of their rights under the Dealers' Day Act.[10]

■ Under Pennsylvania law, executing a contract under duress renders that contract voidable, not void. *National Auto Brokers v. Aleeda Development Corp.*, 243 Pa.Super. 101, 108–09, 364 A.2d 470 (1976). Such a contract can be ratified "if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Id.* at 114, 364 A.2d 470. Nevertheless, Wahsner's and Novin's failure to return the consideration they received in exchange for their resignations and releases does not necessarily mean their duress claim fails. Unlike Pennsylvania law on the validity of releases, Pennsylvania law on the ratification of an otherwise voidable release strikes this court as incongruous with the Dealers' Day Act. For one, the Dealers' Day Act was enacted to provide redress for the very type of activity alleged here—a bad faith termination caused by coercion. As the Supreme Court stated in *Sola Electric Co. v. Jefferson Electric Co.*, "the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules." 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942). *See also Home Box Office v. Spectrum Electronics, Inc.*, 100 F.R.D. 379, 382 n. 1 (E.D.Pa.1983); *Taxin v. Food Fair Stores, Inc.*, 197 F.Supp. 827, 830–31 (E.D.Pa.1961). Because there is a dearth of federal statutory or common law addressing the effect of a party's failure to return consideration, the courts in *Home Box Office* and *Taxin* turned to the *Restatement of Contracts* § 480. The benefits received and retained by Wahsner and Novin were either money or services to which a value can be assigned. If Wahsner and Novin are successful at trial, under

---

9. This court is unpersuaded by defendants' argument that as at will employees, Wahsner and Novin received more than they were entitled to because they could have been terminated without advance notice and without receiving benefits of any kind. Wahsner and Novin have standing to bring an action under the Act and their at will employee status cannot be dispositive of the validity of the releases. To hold otherwise would render meaningless their right to bring an action under the Act.

10. Because there is a material issue of fact with respect to whether Wahsner and Novin were given the opportunity to consult counsel before signing the releases, precluding the granting of summary judgment, this court need not address the business compulsion arguments advanced by the parties.

§ 480 these benefits can be credited against damages once determined.[11]

Defendants' motion for summary judgment is denied and Wahsner and Novin will be allowed to proceed to trial.

---

**11.** Section 480 has been modified somewhat in the *Restatement (Second) of Contracts* § 384. This section provides that a party is not required to return benefits received in order to be granted restitution if "the court can assure such return in connection with the relief granted." § 384(1)(b). Thus, even under the *Restatement (Second) of Contracts*, Wahsner and Novin may proceed if they return to defendants an amount equal to the benefits they received.